**UNITED STATES of America**

v.

**Jose MARTINEZ–TORRES, et al., Defendants.**

**No. SSS 82 CR. 489 (CBM).**

United States District Court, S.D. New York.

Nov. 5, 1982.

John S. Martin, Jr., U.S. Atty. by James R. DeVita, Marc J. Gottridge, Asst. U.S. Attys., New York City, for U.S.

Goldberger, Feldman, Dubin & Weisenfeld, P.C. by Paul A. Goldberger and Lawrence A. Dubin, New York City, for defendants Martinez-Torres and Medina.

Federal Defender Services Unit, Legal Aid Society by John Byrnes, New York City, for defendant Evelyn Soto.

## OPINION

MOTLEY, Chief Judge.

Indictment 82 Cr. 489[1] charges thirteen defendants in twelve counts. Count One charges defendants Jose Martinez-Torres, Anthony Anzalone, Arturo Alamo, Ramon Santiago-Colon, Ramon Molina-Santiago, Nancy Medina, Jose Calvente, Nelson Soto, John Doe,[2] Pablo Rodriquez, Georgina Rodriques-Varga, Iris Norma Rodriquez, and Evelyn Soto with conspiracy to violate the Federal Narcotics Laws, in violation of 21 U.S.C. §§ 812,[3] 841(a),[4] and 841(b)(1)(A).[5] Count Two charges defendant Torres with managing a continuing criminal enterprise in narcotics in violation of 21 U.S.C. § 848.[6] Counts Three and Four charge various defendants with possession with intent to distribute cocaine and heroin. Count Five charges various defendants with conspiracy to violate the federal firearms law in violation of 18 U.S.C. §§ 924(c)(1) and 924(c)(2).[7] Counts Six, Seven, and Eight[8] charge Torres with use of firearms to commit felonies, including the use of various high caliber automatic pistols, a semi-automatic sub-

---

1. The counts set forth below are charged in the Government's third superseding indictment.

2. One of the defendants, John Doe, a/k/a "Teddy," has not yet been arrested. Unless otherwise indicated, Martinez-Torres will be referred to as Torres; Molina-Santiago will be referred to as Santiago and Santiago-Colon will be referred to as Colon.

3. 21 U.S.C. § 812 (1981) establishes the schedules of controlled substances.

4. 21 U.S.C. § 841(a) (1981) makes it unlawful to knowingly or intentionally manufacture, distribute or dispense or possess with intent to manufacture, distribute or dispense either a controlled substance or a counterfeit substance.

5. 21 U.S.C. § 841(b)(1)(A) (1981) provides penalties for violations of § 841(a).

6. 21 U.S.C. § 848 (1981) makes it a crime to engage in a continuing criminal enterprise.

7. 18 U.S.C. §§ 924(c)(1) and 924(c)(2) (1976) specify firearms violations.

8. Defendant Nancy Medina was also named in Count Eight.

machine gun and a submachine gun and silencer, in violation of 18 U.S.C. §§ 924(c)(1) and 924(c)(2). Counts Nine through Twelve charge Torres with failure to comply with the National Firearms Registration and Transfer Record as well as possession of a firearms not identified by serial number, all in violation of 26 U.S.C. §§ 5861(d) [9] and 5871.[10]

Defendants Torres, Medina, and Soto have moved under Federal Rules of Criminal Procedure 41(f) and 12 to suppress all physical evidence obtained as a result of the searches of Apartment 5B at 2526 Bronx Park East and the third floor of premises known as 774 East 236th Street, both in Bronx County, New York. For the reasons discussed below, this motion is denied.

## A. Findings of Fact

On the 4th and 5th of October 1982, an evidentiary hearing was held at which the following facts were established:

For a period of approximately two months, Special Agents of the Drug Enforcement Administration (DEA) had been receiving information from a confidential informant, Luis Colagero Vizzini. Vizzini had been employed by Torres as a bodyguard. As part of his duties, Vizzini accompanied Torres at all times to watch for his safety. Based upon personal observation, Vizzini told Special Agent Marano that Torres headed an enterprise which "cut" [11] and distributed millions of dollars of drugs, principally heroin. Vizzini reported to the DEA Special Agents that he had recently seen in Apartment 5B at 2526 Bronx Park East (Apartment 5B), large quantities of heroin, dilutents, cutting materials, including scales and bags, ledger books, ammunition, handguns, and two machine guns. He identified individuals who cut heroin there and used the apartment as a base for the large-scale distribution of narcotics. He advised the Special Agents that the occupants of Apartment 5B used the apartment to traffic in narcotics and were always heavily armed.

The information reported by Vizzini was corroborated by the Special Agents in two ways. First, Special Agent Federick Marano, who headed the investigation, personally observed people entering and leaving at the 2526 Bronx Park East address that matched descriptions given by Vizzini. Second, a DEA undercover agent was invited by Torres into Apartment 5B about a week before the arrests and searches occurred on July 2, 1982. The undercover agent in turn confirmed the descriptions given by Vizzini.

At approximately 10 p.m. on July 1, 1982, Vizzini informed Marano by telephone that several individuals had just left Apartment 5B after cutting a quantity of heroin and that money, drugs and two machine guns were then in the apartment. Marano arrived at 2526 Bronx Park East (the building) at approximately 11 p.m. As he parked his car, Marano saw a yellow Ford, which Torres had been observed driving on several occasions, pull to the curb nearby on the same street. Marano then observed Torres and his wife Nancy Medina leave the car and enter the building. Shortly, Marano was joined in his car by Special Agent Tom Ward.[12] At approximately 11:30 p.m., Marano and Ward observed two men, defendants Colon and Santiago, leaving the building. One of the men was carrying a brown paper bag.[13] The two men entered a gray Mercury automobile and drove to the vicinity of Watson Avenue in the Bronx where the car stopped. Marano and Ward, who had followed the two men to Watson Avenue, then saw Colon and Santiago leave

---

**9.** 26 U.S.C. § 5861 (1980) provides penalties for firearms violations.

**10.** 26 U.S.C. § 5871 (1980) provides penalties for firearms violations.

**11.** To "cut" heroin refers to mixing heroin with a dilutent such as quinine. The mixture is then sold.

**12.** Agents Marano, Ward, and all the Special Agents were dressed in civilian clothes.

**13.** It was unclear which defendant, Santiago or Colon, held the bag.

the car. At approximately 12:30 p.m., the two men again appeared on the street and entered their car at which point Marano and Ward placed them under arrest. Marano and Ward were then joined by another agent and all three agents proceeded to search Colon, Santiago, and the Mercury. The agents failed to recover the brown paper bag.[14]

The agents then drove the two men to the parking lot of a McDonald's restaurant located one block from Apartment 5B. At that point, Marano received a transmission on the radio from other DEA agents who had arrived at 2526 Bronx Park East. The transmission described two men, Torres and Vizzini leaving the building and entering a yellow Ford automobile. Marano instructed the DEA surveillance team to follow Torres and that he and several DEA surveillance units would join in the pursuit of the Ford. The DEA agents followed the Ford for approximately five blocks before Torres, the driver of the Ford became aware that he was being followed. When he arrived at 213th Street in the Bronx, Torres engaged in a series of evasive turns, accelerating his vehicle to a speed of about 60 miles per hour in a 30-mile-an-hour zone. When Torres reached White Plains Road, he made a right turn. He then handed Vizzini his gun. Vizzini, at the direction of Torres, threw out both Torres's gun and his own gun. Ken Johnson, one of the DEA agents following the two men, saw objects leave the car window, but it was not determined until later when the objects were recovered that guns had been thrown out of the Ford.

Torres continued along White Plains Road until he arrived at Gun Hill Road where he made a right turn and headed towards the Bronx River Parkway. Before Torres reached the entrance to the highway, he stopped at an intersection and waited approximately three to four minutes to allow a woman and her child to cross the street. While Torres was stopped, a Ford Granada driven by Ward pulled in front of the yellow Ford. As the other DEA vehicles arrived, Marano, armed with a shotgun, ordered Torres and Vizzini out of their car. Both men were searched, handcuffed, and arrested. Santiago, Colon, and Vizzini were all placed in the yellow Ford and Torres, with his wrists handcuffed behind him, was placed alone in the backseat of the Ford Granada driven by Ward. All of the DEA cars then drove to the McDonald's parking lot. In the parking lot, Marano left his car and entered the Ford Granada. Before Torres said anything to him, Marano, speaking in English, identified himself as a federal agent and then read Torres his *Miranda* rights. After each right was read, Marano asked Torres if he understood what he had just heard. Calmly and speaking in English, Torres, who is forty years old, and has been arrested three times previously and convicted twice,[15] answered "yes" to each question.[16] Marano and Torres then had a discussion in English lasting approximately ten minutes. At all times during this discussion, Marano's gun was holstered and out of sight.[17] No other agents were present.

14. At some time during the evening, Vizzini saw one of the two defendants, Santiago or Colon, take a bag out of his clothing and attempt to kick it under the seat of his car. The agents later recovered the bag.

15. Martinez-Torres' most recent previous arrest occurred in April 1982. Two previous arrests have led to convictions; the third case is pending in Supreme Court, Bronx County. *See* Government's Exhibit Two.

16. Agent Marano read Torres his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The DEA uses an oral rights card admitted during the evidentiary hearing as Government's Exhibit

One. The last question on the card is, "Do you elect to waive your rights?"

17. During the hearing, Torres repeatedly stated that the DEA agents employed menacing tactics, threatening him with guns or violence. The court finds this testimony to be incredible. For example, Torres recounted this incident:

I was handcuffed like this (indicating) the whole time. But before that, when we were on the road, the person driving the car, a really big guy, he was driving like this with his hand on the wheel and the other arm put up like this, with a pistol in his hand like pointed to my head, like this, in the way I am sitting now (indicating). And in front there were more cars and behind there were more

In this discussion, which occurred at approximately one a.m. on July 2, 1982, Marano told Torres that the DEA agents wished to enter Apartment 5B that night. He advised Torres that a DEA undercover agent had been inside Apartment 5B, had described the drug activities, the dangerous weapons and ammunition inside, and that the DEA intended to obtain a search warrant. Marano further said that although he could obtain a search warrant (because of his knowledge of the existence of weapons in that apartment), he would prefer to enter peaceably with Torres' consent and in his presence. Torres informed Marano that his wife and baby were in the apartment and that he was concerned for their safety. Marano replied that he was aware that there were women and children in the apartment and that injury to either the DEA agents or the occupants of the apartment could be avoided. Torres then stated that if he could be assured that no one would be harmed, then he would agree to have the agents enter the apartment. Marano assured Torres that if at all possible no one would be harmed. At that point Torres calmly stated in English that he would take Marano into Apartment 5B.

Marano then led the team of DEA cars to the building located one block from the McDonald's parking lot. Marano, Torres, and several other agents exited their vehicles and entered the building. Led by Marano, the DEA team and Torres climbed the stairs to the fourth floor. There Marano assigned several agents to the roof of the building and instructed others to guard the fire escape, kitchen and bedroom windows once the team was inside the apartment. Once these final assignments were given,

the DEA team and Torres ascended to the fifth floor. Once in front of Apartment 5B, Torres shouted through the closed door asking the inhabitants to open the door allowing the agents to enter with him. As soon as Torres stated that federal agents or police were with him, the agents heard scuffling, anxious voices, and rapid footsteps from inside the apartment. Then Marano asked Torres to let the agents into the apartment. Torres responded by motioning to a ring of keys attached to his belt by a key chain. Marano took the ring of keys and held up one key at a time to Torres who still had his wrists handcuffed behind him. Torres nodded when Marano held up the right key. Marano then placed the key in the lock and opened the door. Torres and Marano entered the apartment together followed by five or six agents who had their guns drawn. Once inside, Marano immediately ordered the inhabitants to remain stationary and to stop whatever they were doing while the other agents went from room to room searching for any inhabitants who were armed. Marano and Agent Nargi walked to the kitchen and saw two women seated around the kitchen table, Norma Rodriquez and Evelyn Soto. In the center of the table was an opened brown paper bag. Nagri approached the table and looked into the bag. In the brown bag was a package of white powder and a large number of dollar bills.

Marano and Nagri then performed a field test [18] on the white powder and determined that the substance was heroin. Thereafter, Marano went from the kitchen into a bedroom where he saw a young boy asleep on a bed. Turning on a lamp, Marano saw several boxes of ammunition of various calibers and an Ohaus scale supported by

cars. And he told me not to move because he was going to kill me.

Transcript of Hearing (Tr.) at 218. During the hearing, Torres' gestures during the above testimony clearly indicated that a pistol was being held to his temple. Yet just before these statements were made, Torres also stated, "So over there in the parking lot of McDonald's, I was seated behind in the back seat of the car when he [Marano] came over to my car and he said I had to take him to my house." Tr. at 218. This completely undermines Torres' earlier statement that a gun was pointed at his head.

The court simply cannot envision how an agent could hold a gun to Torres' temple while the defendant was seated in the back seat.

18. A field test determines only whether the substance is a controlled substance under 21 U.S.C. § 812 (1981) but cannot determine the purity of the drug. Later the DEA Northeast Regional Laboratory analyzed the contents to be approximately 55 grams of heroin of approximately 30 percent purity. See Government's Exhibit Four.

shelves on one wall. On the opposite wall was a cabinet with glass panelled doors supplied with large glass jars filled with a white powder. Laboratory analysis later determined that the substance was quinine, a heroin dilutent. On the right of the doorway were several large cardboard boxes which were approximately 4½ feet in height and 2 feet in width containing thousands of wax paper glassine envelopes with the name "La Tumba," the Spanish word for tomb, stamped on them.[19] At that point, Marano called Assistant United States Attorney Richard Martin and informed him of the entry into Apartment 5B. Martin and Marano then placed a conference telephone call to Magistrate Kent Sinclair in order to apply for a telephonic search warrant under Fed.R.Crim.P. 41(c)(2).[20] Based upon oral testimony, the transcription of which is set out in the margin,[21] Magistrate Sinclair issued the

**19.** Agent Marano explained that "La Tumba" functions like a brand name, and enables purchasers to know in advance what type of heroin they are receiving. Tr. at 55.

**20.** Fed.R.Crim.P. 41(c) establishes the procedure used to obtain a telephone warrant.

**21.** TRANSCRIPT OF TELEPHONIC SEARCH WARRANT APPLICATION

July 2, 1982

 Re: 2526 Bronx Park East, Apt. 5B

KS (Magistrate Sinclair): Hello

AUSA (Richard Martin): Hello Magistrate Sinclair.

KS: Good morning, I have my tape recording equipment functioning.

AUSA: Okay. Fred, are you there?

AGT (Agent Marano): Yes, I am.

AUSA: This is, I've prepared the form for the telephonic search warrant. And it's United States of America vs. 2526 Bronx Park East, Apt. 5B (as in boy), Bronx, N.Y. and that is the subject premises:

 [Form being read as follows:]

 "Oral testimony having been communicated to me by Fred Marano that he has reason to believe that on the premises known as 2526 Bronx Park East, Apt. 5B, Bronx, New York, in the Southern District of New York, there is now being concealed certain property, namely heroin, dilutents, other narcotics and contraband and evidence of narcotics related activity, including records, moneys, proceeds, and weapons and ammunition, and two suitcases."

AUSA: There follows the language that the magistrate is "satisfied of the circumstances to dispense with the written affidavit" and then commands that "the search be completed within the period of" and I have filled in "10 days" and the person or place named, or the time is "anytime in the day or night," I've crossed out "6 a.m. to 10 p.m." and I've filled in that on July 2d 1982 that the application was made before your Honor. Together with that we've prepared the following affidavit:

 "Fred Marano, being duly sworn, deposes and says:

1. I am a special agent of the Drug Enforcement

2. Administration, and I am familiar with the facts

3. relating to this matter.

4. During the past three (3) weeks I and other

5. fellow agents have received information from a

6. confidential informant whose reliability has been

7. established previously and has been established by

8. the investigation conducted in this case that the

9. premises at 2526 Bronx Park East have been and

10. currently are being used as a storage location for

11. heroin, weapons and ammunition, narcotics cutting

12. material, money and records. At approximately 10 p.m.

13. on July 1, 1982 I received further information from

14. this informant to the effect that a large

15. number of people had just left the subject premises

16. after cutting one (1) to two (2) pounds of

17. heroin and that there was presently money, drugs

18. and two (2) machine guns in the apartment. I proceeded

19. ceeded to 2526 Bronx Park East, Apt. 5B, and placed

20. the two (2) individuals under arrest just after

21. they had left Apartment 5B. As we approached the

22. two (2) individuals to question them, two (2) handguns

23. guns were thrown out of the vehicle they had entered

24. after they left Apartment 5B. Following the arrest

25. of those two (2) individuals agents went to Apartment

26. ment 5B where several more people were. The agents

27. saw and I have seen in plain view a paper bag containing

28. taining about ½ ounce of heroin and money and in

search warrant which was subsequently executed.

## B. *Discussion*

Defendant Torres, Medina, and Soto,[22] have moved under Fed.R.Crim.P. 41(f) and 12 to suppress evidence seized at Apartment 5B, 2526 Bronx Park East.[23] Defendants contend that the search warrant was illegally obtained because it was based upon an affidavit which failed to provide probable cause. According to defendants, the affidavit is deficient for two reasons. First, that portion of the affidavit which reports the Special Agents' "plain view" observations [24] under the doctrine established by *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), was improperly considered by the magistrate because the agents did not have Torres's consent to enter Apartment 5B. Second, purged of these plain view observations, the remainder of the affidavit which relates the information provided by the confidential informant [25] and the corroboration of that infor-

29. another part of the apartment a jar filled with
30. powder scales, ammunition, two (2) suitcases which
31. were very heavy and which the confidential informant
32. says contain machine guns and a safe and several
33. boxes. The agents entered the apartment after gain-
34. ing permission to enter from the owner of the apart-
35. ment who was just arrested but who would not con-
36. sent to a search. The confidential informant has
37. told us that several other people are expected to
38. arrive at the apartment this morning and that they
39. are armed. Therefore, we seek this telephone war-
40. rant to search the premises of the subject apartment
41. this morning before six a.m. to avoid any further
42. danger and to assure that the contents of the apart-
43. ment are not disturbed. In addition, there are now
44. several people in the apartment. Fred Marano.

KS: How do, you spell Agent Marano's last name?
AGT: M–A–R–A–N–O
KS: All right. Agent Marano, do you solemnly swear that facts set forth in the affidavit which Mr. Martin has just read are true to the best of your knowledge?
AGT: Yes sir I do.
KS: I'm satisfied that there are circumstances that make it necessary to dispense with the normal affidavit procedure, and accepting that there is probable cause to support a search warrant at this time.
AGT: O.K.
KS: Mr. Martin would you be kind enough to read me again the description of the property that you have written on the copy of the warrant?

AUSA: Yes.
KS: form.
AUSA: The property named is heroin, dilutents, other narcotics and contraband.
KS: Slow down, and other
AUSA: narcotics.
KS: All right, and contraband. All right.
AUSA: and evidence of narcotics related activity, including records.
KS: Go ahead, just go slow.
AUSA: money proceeds and weapons and ammunition and two suitcases.
KS: All right Mr. Martin, I authorize you to sign my name to the warrant form that you have read me and to note the time of 3:42 a.m. as the issuance point for this warrant.
AUSA: I will.
KS: And if you would get whatever you have typed-up and brought to me today I would appreciate it.
AUSA: I will do that. Thank you very much your Honor. I'm sorry to disturb you.
KS: All right gentlemen.
AGT: Thank you sir.
AUSA: Goodbye.
KS: Goodbye.

22. Although defendant Soto was not originally one of the movants in defendants' motion to suppress, this court permitted Soto to join the motion during the evidentiary hearing. Tr. at 29.

23. Defendants further claim that since the search of 774 E. 236th Street is based entirely upon the evidence seized from 2526 Bronx Park East, if the search of 2526 Bronx Park East is illegal its progeny, the search of 774 E. 236th Street is also illegal. Defendants' Memorandum in Support of the Motion to Suppress at 5.

24. Lines 26–36 of the oral affidavit. *See* note 16 *supra.*

25. Lines 4–18, 36–39 of the oral affidavit. *See* note 16 *supra.* Although lines 36–39 seem to describe information given *after* the entry of the apartment and later on the morning of July

mation[26] does not provide probable cause since it fails the dual test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). If the search was constitutionally impermissible, the tainted evidence is inadmissible at trial. *Weeks v. United States,* 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914).

The Government contends that the DEA agents did have Torres' consent. However, assuming the agents did not have consent, the remainder of the affidavit provided sufficient probable cause to justify the issuance of the warrant. *United States v. Lace,* 669 F.2d 46, 49 (2d Cir.1982) (ultimate inquiry on motion to suppress is not whether underlying affidavit contained allegations based on illegally seized evidence, but whether, putting aside all tainted allegations, lawful information in affidavit suffices to show probable cause); *United States v. Agapito,* 620 F.2d 324, 338 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *see United States v. Giordano,* 416 U.S. 505, 554–56, 94 S.Ct. 1820, 1845–46, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part); *see e.g., James v. United States,* 418 F.2d 1150, 1151 (D.C.Cir.1969) ("when an affidavit in support of a search warrant contains information that is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the issuance of a warrant"); *United States v. Epstein,* 240 F.Supp. 80, 82 (S.D.N.Y.1965) (Weinfeld, J.) ("[W]hen a warrant issues upon an affidavit containing both proper and improper grounds, and the proper ground—considered alone—are more than sufficient to support a finding of probable cause, inclusion of the improper grounds does not vitiate the entire affidavit and invalidate the warrant"). Since this court agrees with the

Government's argument, the next step in the analysis is to determine whether the untainted portions of the affidavit supply probable cause.

### 1. The Application of the Aguilar-Spinelli Test

Purged of its purportedly tainted portions, the affidavit states:

During the past three (3) weeks I and other fellow agents have received information from a confidential informant whose reliability has been established previously and has been established by the investigation conducted in this case that the premises at 2526 Bronx Park East have been and currently are being used as a storage location for heroin, weapons and ammunition, narcotics cutting material, money and records. At approximately 10:00 p.m. on July 1, 1982 I received further information from this informant to the effect that a large number of people had just left the subject premises after cutting one (1) to two (2) pounds of heroin and that there was presently money, drugs and two (2) machine guns in the apartment. I proceeded to 2526 Bronx Park East, Apartment 5B, and placed the two individuals under arrest just after they had left Apartment 5B. As we approached the two individuals to question them, two (2) handguns were thrown out of the vehicle they had entered after they left Apartment 5B... The confidential informant has told us that several other people are expected to arrive this morning and that they are armed.

■ It is well settled that probable cause may be established by hearsay evidence. Fed.R.Crim.P. 41(c); *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). However, the

---

2, 1982, it is still properly considered under the *Aguilar-Spinelli* test because it is still information from a confidential informant before the magistrate. *See, e.g., Aguilar v. Texas,* 378

U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964).

**26.** Lines 18–24 of the affidavit. *See* note 16 *supra.*

magistrate must have a substantial basis for crediting the hearsay. *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971); *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *United States v. Morill,* 490 F.Supp. 477, 478 (S.D.N.Y.1980). It is beyond dispute that a substantial basis for crediting the hearsay is established if the affiant sets forth in the warrant application 1) "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were" and 2) "some of the underlying circumstances from which the officer concluded that the informant was 'credible' or his information 'reliable.'" *Spinelli v. United States,* 393 U.S. 410, 413–414, 89 S.Ct. 584, 587–88, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Dunloy,* 584 F.2d 6 (2d Cir.1978); *Mapp v. Warden, New York State Correctional Institution for Women,* 531 F.2d 1167 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States v. Karathanos,* 531 F.2d 26 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); *United States v. Rollins,* 522 F.2d 160 (2d Cir.), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Sultan,* 463 F.2d 1066 (2d Cir. 1972); *United States v. Hillard,* 542 F.Supp. 487 (S.D.N.Y.1982); *United States v. Morill,* 490 F.Supp. 477 (S.D.N.Y.1980).

 The purpose of the "two-pronged" test enunciated in *Aguilar v. Texas* is to assure 1) that inferences supporting probable cause will be drawn by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States,* 333 U.S.

10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1947); and 2) that the magistrate will not function merely as a rubber stamp but will issue search warrants only when the facts are sufficient [27] to satisfy a reasonably prudent person that a crime is being committed or evidence of it kept on the premises to be searched, *see United States v. Karathanos,* 531 F.2d 26, 30 (2d Cir.1976); and 3) that the informant's information was obtained in a reliable way rather than through neighborhood gossip, underworld speculation, or generally unfounded accusations. *See Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

 Following Professor LaFave's useful analysis, this court shall refer to the first prong of the *Aguilar-Spinelli* test as to the "basis of knowledge prong" and the second as the "veracity prong." 1 W. LaFave, *Search and Seizure* § 3.3 at 500 (1978). The basis of knowledge prong is concerned with the empirical source of the informant's information or the raw data from which he derived his information. The magistrate must be able to judge from the facts set forth in the affidavit whether the informant had an empirical basis for claiming that evidence of a crime is secreted at a certain place or that an individual has committed a crime. *See e.g., United States v. Karathanos, supra,* 531 F.2d at 30. Even if the first prong is satisfied, the magistrate must determine that given an adequate empirical basis, the informant has obtained truthful information from that source. Thus, the veracity prong requires that facts must be brought before the magistrate so that he may determine *either* the inherent credibility of the informant *or* the reliability of his information on that particular occasion.[28]

---

**27.** It is elementary that in deciding whether the warrant was issued upon probable cause, the reviewing court can consider only the information before the magistrate at the time the warrant was issued. *Aguilar v. Texas,* 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964) citing *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); *United States ex rel. Rogers v.*

*Warden of Attica State Prison,* 381 F.2d 209 (1967).

**28.** Thus, the veracity prong may be said to have a "credibility spur" and a "reliability spur." LaFave, *supra* at 550. While the warrant affidavit must satisfy *both* the basis of knowledge and the veracity prongs, *United States v. Karathanos,* 531 F.2d 26, 32 (2d Cir. 1976) (when affidavit fails to satisfy first prong

■ With this framework in mind, the court now turns to the question of whether this warrant affidavit supplied probable cause. With respect to the basis of knowledge prong, it is axiomatic that personal observation is an adequate source of information. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Mapp v. Warden, New York State Correctional Institution for Women,* 531 F.2d 1167 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States v. Rollins,* 522 F.2d 160 (2d Cir.), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1975). When, as here, informant fails to state how he obtained his information, "it is especially important that the tip describe the accused's *criminal activity* in *sufficient detail* that the magistrate may know he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States,* 393 U.S. at 416, 89 S.Ct. at 589 (emphasis added). By setting forth such detail, the affidavit provides a basis from which the magistrate can "reasonably infer that the informant got his information in a reliable way." *Id.* at 417, 89 S.Ct. at 589.

■ As set forth above, the self-verifying detail test, *see Spinelli v. United States,* 393 U.S. at 425, 89 S.Ct. at 593 (White, J. concurring) ("an 'honest' informant's report, if sufficiently detailed will in effect verify itself"), refers both to the quantity and the nature of the detail. As Justice White further explained:

> Detailed information may sometimes imply that the informant himself has observed the facts. Suppose an informant with whom an officer has had satisfactory experience states that there was gambling equipment in the living room of a specified apartment and describes in detail not only the equipment itself but also appointments and furnishings of the apartment. Detail like this, if true at all,

must rest on personal observation either of the informant or of someone else. If the latter, we know nothing of the third person's honesty or sources; he may be making a wholly false report. But it is arguable that on these facts it was the informant himself who had perceived the facts, for the information reported is not usually the subject of casual, day-to-day conversation. Because the informant is honest and it is probable that he has viewed the facts, there is probable cause for the issuance of a warrant.

*Id.* at 425–426, 89 S.Ct. at 594. The quantity of the detail particularizes the object described and distinguishes it from other similar objects. The nature of the detailed information is one indication of whether it is the subject of neighborhood gossip or conjecture. When a sufficiently detailed tip provides information of an incriminating nature, it is arguable that it was the informant himself who perceived the facts since the detailed incriminating information is not usually the "subject of casual, day-to-day conversation." *Id.* at 426, 89 S.Ct. at 594. This court believes that such self-verifying detail is to be found in Agent Marano's warrant affidavit as follows: "At approximately 10:00 p.m. on July 1, 1982 I received further information from this informant to the effect that a large number of people had just left the subject premises after cutting one (1) to two (2) pounds of heroin and that there was presently money, drugs and two (2) machine guns in the apartment." That the informant could identify both the amount of heroin and the two machine guns makes it "arguable that on these facts, it was the informant himself who has perceived the facts, for the information reported is not usually the subject of casual, day-to-day conversation." *Spinelli v. United States, supra,* 393 U.S. at 426, 89 S.Ct. at 594. In this instance, the details disclosed and the incriminating and

of *Aguilar-Spinelli,* there was no probable cause), it may meet the latter requirement by satisfying *either* the credibility spur *or* the reliability spur. *Contrast* Government's Memo-

randum in Opposition to Defendants' Pre-trial Motions at 10 ("credibility *and* reliability of the *informant* ") (emphasis added).

dangerous nature of the information,[29] combined with the reliability of the informant discussed below, make it probable that the informant "is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based upon an individual's general reputation."[30] In addition, that the statement was so near in time to the criminal activities indicated (at approximately 10:00 p.m.) is another element of specificity similar to a detail of physical description and further makes it unlikely that the informant "obtained his information from an offhand remark heard at a neighborhood bar."[31]

■ Not only must an informant have an adequate basis of knowledge, but facts must be set forth in the warrant indicating that the informant was credible or his information reliable. This court believes that there are sufficient indicia of the informant's credibility, when combined with the corroboration of his veracity, to satisfy the second prong of the *Aguilar-Spinelli* test.

■ In *United States v. Freeman,* 358 F.2d 459 (2d Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 168, 17 L.Ed.2d 109 (1966), the court considered whether the statement that information was received from an "informant of previous reliability" satisfied the veracity prong of *Aguilar.*[32] In that case the issue before the court was "whether or not the statement that the source of the hearsay was an 'informant of previous

reliability' offered . . . a 'substantial basis'" for "crediting the hearsay." *Id.* at 461. In deciding that this statement provided an adequate basis of credibility, the court stated:

> Unlike *Aguilar,* where the mere recitation that the unidentified informant was a "credible person" provided no basis on which to judge his reliability, in the present case "some of the underlying circumstances" from which [the Agent] concluded that the informant was credible, were given. The attestation to the informant's "previous reliability" presents a "firmer foundation for belief than the 'totally innocuous' corroborating details sometimes cited as make weights."

358 F.2d at 463 (citations omitted). The court then concluded:

> [W]e consider the affidavit in this case to be sufficient to support the issuance of a search warrant, although the case would have been much clearer had the length of time Agent Benjamin had known and dealt with the informant, the number of times information had been received from the informant and a statement as to the accuracy of such information had been presented to the Commissioner.

*Id.* at 463. This court believes that *United States v. Freeman* sets the minimum standard below which an affidavit demonstrating the informant's credibility may not fall.[33] In this case, this court believes that

29. During his cross-examination, Torres stated, "[A]nybody who is in the drug world has to be careful because people can be behind you trying to kill you for any reason." Tr. at 245.

30. *Spinelli v. United States,* 393 U.S. at 417, 89 S.Ct. at 589.

31. Indeed, the time element here is important for two reasons. First, the temporal proximity of the statement to the activities it describes is another reason why this statement is far removed from rumor since by definition rumor needs time to circulate. Second, that the statement also *fixes* in time the events described adds a detail which functions like a detail of physical description.

32. The warrant affidavit stated as follows:
 [T]he facts tending to establish the foregoing grounds for the issuance of a search warrant are as follows: The heroin was seen within

the premises on this date by an informant of previous reliability. On March 11, 1963, and March 12, 1963, the occupant of the premises was observed in meeting with known addicts and the aforesaid informant saw him transfer narcotics to known addicts.
*United States v. Freeman,* 358 F.2d at 461.

33. In addition, Professor LaFave has pointed out that in *Aguilar v. Texas,* the Supreme Court distinguished the affidavit before it from the one it had upheld in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1964), which merely alleged that the informant has "given information . . . on previous occasions and which was correct." Since the *Aguilar* court set out the *Jones* affidavit in full in a footnote in order to demonstrate how an affiant might set forth some of the "underlying circumstances from which the officer concluded that the informant . . . was 'credible,'" *Aguilar*

Agent Marano's affidavit stating that this is a "confidential informant whose reliability has been established previously and has been established by the investigation conducted in this case" is a "clearer case" ·than that involved in *United States v. Freeman,* because the statement of the informant's reliability, even if inadequate by itself to satisfy the veracity prong, is corroborated by independent DEA investigative efforts.

■■■ *Spinelli's* contribution to the *Aguilar-Spinelli* test is its explanation of the role that independent police investigation serves in corroborating an informant's tip:

> The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources is as trustworthy as a tip which would pass *Aguilar's* tests without corroboration? ... A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which—even when partially corroborated—is not as reliable as one which passes *Aguilar's* requirements alone.

393 U.S. at 415, 89 S.Ct. at 588. Thus, under *Spinelli,* this court is to first determine whether the informant's information alone can pass the *Aguilar* test. If the tip alone is inadequate then the court should consider any additional statements corroborating the informant's tip and determine whether the corroboration remedies the deficiency. Throughout the entire analysis, however, the magistrate's decision must be guided by the principle that any corroboration must completely cure any deficiency under *Aguilar* so that the tip combined with

> can hardly be read as disapproving of such a general allegation of the informant's credibility.

the corroboration is the equivalent of a tip which requires no corroboration. This court believes that the affidavit's statement that this informant's "reliability has been previously established and has been established by the investigation in this case"—apparently alone sufficient to satisfy the veracity prong under the doctrine of *United States v. Freeman*—is entirely as reliable as an affidavit which satisfies the *Aguilar-Spinelli* test without corroboration when the statements in the affidavit confirming the informant's veracity are considered.

■ In examining the issue of corroboration, it is important to note that the investigation need not exactly confirm the informant's tip. Instead, incriminating corroboration has consisted of police seeing or hearing activity which reasonably suggested efforts directed to the planning, carrying out, or concealing of criminal activity. *See United States v. Manning,* 448 F.2d 992, 998 (2d Cir.) (on rehearing en banc), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971) (Friendly, J.) (untested informant said he saw defendant in home of his girlfriend with narcotics; officer confirmed certain facts given by the informant plus fact that informant's car was then parked in area, but even if that was not enough, anything lacking in scales was supplied by the agents' hearing running, scuffling, and hurried conversations inside the apartment after agent had knocked on door and twice identified himself as a federal agent); *see also United States v. Lace,* 669 F.2d 46 (2d Cir.1982); *United States v. Rollins, supra.*

In this case the corroboration consisted of Marano's statement that when agents approached the two men who had just left Apartment 5B, "two (2) handguns were thrown out of the vehicle they had entered after they left Apartment 5B." Not only does this incriminating corroboration suggest efforts at concealing criminal activity, but it also lends some direct support for the informant's earlier statement that Apartment 5B was used as a storage of weapons.

*See* LaFave, *Search and Seizure,* § 3.3 at 517 (1978).

Finally, this court is required by the United States Supreme Court to test affidavits in a "common-sense and realistic fashion" rather than with "a grudging or negative attitude." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In that case, the Supreme Court held:

> [W]here reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

380 U.S. at 109, 85 S.Ct. at 746. *See also United States v. Cale,* 508 F.Supp. 1038 (S.D.N.Y.1981); *United States v. Adames,* 485 F.Supp. 965 (E.D.N.Y.) *aff'd without op.,* 652 F.2d 55 (2d Cir.1981). Under the foregoing standards this court concludes that the untainted portion alone of the warrant affidavit supplied probable cause for the issuance of a search warrant.[34]

2. *Consent*

This court further finds that Agent Marano negotiated with Torres the terms of entry into the apartment and in that connection secured Torres' voluntary consent to enter Apartment 5B. Since their entry was lawful, the agents' plain view observations were properly considered by the magistrate.

The principles governing consent were cogently stated by the Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). A search conducted without a warrant or probable cause is constitutionally permissible if consented to by the person in control of the property to be searched. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Vasquez,* 638 F.2d 507 (2d Cir.), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981), *cert. denied sub nom. Mesa v. United States,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981); *United States v. Sanchez,* 635 F.2d 47 (2d Cir.), *on remand,* 499 F.Supp. 622 (E.D.N.Y. 1980), *aff'd without op.,* 647 F.2d 163 (2d Cir.1981). If a consent to search is constitutionally permissible than *a fortiori,* consent to enter must be valid if voluntary.

The Government has the burden to prove by the preponderance of the evidence that consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Buettner-Janusch,* 646 F.2d 759 (2d Cir.1981), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981); *see also United States v. Valencia,* 645 F.2d 1158, 1165 (2d Cir.), *reh. denied,* 669 F.2d 37 (2d Cir.), *aff'd,* 677 F.2d 191 (2d Cir.1982) ("In order to establish a valid consent, it need not be shown that there has been a knowing and intelligent waiver of the right to refuse consent"). In determining whether the Government has met its burden, no single fact or criterion is controlling, rather the court must assess the "totality of the surrounding circumstances—both the character of the accused and the details of the interrogation." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047; *see also United States v.*

---

**34.** The defendants also contend that Agent Marano's affidavit contains inaccuracies and erroneous factual assertions. For example, the warrant affidavit states that Marano saw guns thrown out of a car as he approached two men for questioning (*see* lines 21–24 of the warrant affidavit, note 16 *supra*) whereas Agent Marano admitted that he did not approach the two men and did not discover that the objects thrown out were guns until much later that evening (*see* Tr. at 132, 135). The court finds that these inaccuracies and others raised by defendants' counsel do not rise to the level of false statements knowing and intentionally made, or with reckless disregard for the truth sufficient to attack the validity of the affidavit. *See Franks v. Delaware,* 438 U.S. 154, 171–172, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978); *United States v. Cale,* 508 F.Supp. 1038, 1040 (S.D.N.Y.1981).

*Forero-Rincon,* 626 F.2d 218, 224 (2d Cir. 1980) (consent is a question of fact to be determined from totality of all the circumstances).

If a person who gave the claimed consent was in police custody, the court must be "particularly sensitive to the heightened possibilities of coercion," *Schneckloth v. Bustamonte, supra,* 412 U.S. at 240, 93 S.Ct. at 2054; however, the fact of custody alone does not render the consent coerced. *United States v. Sanchez, supra,* 635 F.2d at 58; *United States v. Wiener,* 534 F.2d 15, 17 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Relevant factors include the age and the intelligence of the subject and whether he was deprived of food or sleep or subjected to other physical abuse. *United States v. Sanchez,* 635 F.2d at 58.

Examining closely the facts established at the hearing, this court notes that at all times, the DEA agents wore civilian clothes and that Agent Marano's gun was holstered and out of sight during the negotiations. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Torres is forty years old, has been convicted twice and is no "newcomer to the law," *id.* at 424–25, 96 S.Ct. at 828. The court further finds that the defendant was resigned and calm during the discussion with Marano, *United States v. Sanchez, supra,* 635 F.2d at 60, that he speaks and understands English well enough[35] to have "understood what was going on," *United States v. Bronstein,* 521 F.2d 459, 463 (2d Cir.), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1975) (footnote omitted), and that the

tone of the discussion was conversational. *United States v. Price,* 599 F.2d 494, 503 (2d Cir.1979).

The court further finds that Agent Marano's expression of concern with respect to the inherent danger involved in a non-consensual entry into an apartment full of dangerous weapons cannot be construed as a threat. Agent Marano did not warn Torres that the agents would seek to intentionally expose the inhabitants of Apartment 5B to peril if Torres would not give his consent. Rather, Agent Marano simply stated the obvious—that a non-consensual entry by armed federal agents into the lair of a narcotics ring containing a cache of dangerous weapons exposes both the agents and the occupants to extreme peril. Given the obvious dangers involved, this court finds that Torres and Agent Marano reached a practical solution to a difficult problem—that of entering Apartment 5B without exposing either side to harm.

Torres' voluntary choice becomes even more rational in light of Agent Marano's statement that the DEA intended to get a warrant. Under the law of this Circuit the statement that the DEA *intended* to get a warrant does not necessarily vitiate consent. *United States v. Vasquez, supra,* 638 F.2d at 528. In *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974), the court stated that "[t]he well founded advice of a law enforcement agent that absent a consent to search, a warrant can be obtained does not constitute coercion." In *United States v. Vasquez, supra,* Judge Kearse clearly distinguished this case from the inherent coercion involved when the officers

---

**35.** Despite Torres' protestation about his inability to understand English, this court concludes that his understanding of English was more than adequate for him to give valid consent. For example, during his testimony Torres stated the following:

So when they put me right in front of the elevator, they were taking me from one floor to the next floor, until we arrived at Apartment 4B, on the fourth floor. And then [Marano] put me right in front of the door to 4B, together with all of the agents, and he began to give instructions to the other agents that the apartment on top of this one was 5B,

and they should go up to the roof and check it out, to check out the fire escapes windows, the kitchen window, and up to where the air conditioner was and the other window in the bedroom.

Tr. at 221. Since Agent Marano can converse only in English (Tr. at 45), Torres' command of English appears sufficient to allow him to understand complicated instructions which were no doubt hastily given. Under these circumstances, Torres was certainly capable of engaging in a ten minute discussion and giving valid consent.

stated that they already had a warrant. *United States v. Vasquez, supra,* 638 F.2d at 529; *see Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Judge Kearse reserved decision on the question of consent where there was no probable cause for the issuance of a warrant and the agents were aware of that fact but nevertheless allowed the defendant to base his consent on the mistaken belief that a warrant could be obtained. *United States v. Vasquez, supra,* 638 F.2d at 529; *see also United States v. Curiale,* 414 F.2d 744 (2d Cir.), *cert. denied,* 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969).

In this case, there was no doubt that Agent Marano gave Torres "well founded belief" that [DEA] could obtain a warrant." *United States v. Vasquez, supra,* 638 F.2d at 529. Judge Kearse's language refers to an objective standard. Where, as here, the Government has a confidential informant who had seen narcotics activity, and an undercover agent who had been inside the apartment, as well as corroborating surveillances, there is little doubt that if stated correctly the Government's affidavit would supply probable cause. *See e.g., United States v. Dunloy, supra,* 584 F.2d at 10; *United States v. Sultan,* 463 F.2d 1066 (2d Cir.1972).

 Considering the "totality of the surrounding circumstances—both the char-

acter of the accused and the details of the interrogation," *Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047, this court finds that Torres freely and voluntarily gave the DEA agents his consent to enter Apartment 5B. When Agent Marano stated that the DEA intended to obtain a warrant, Torres then knew that refusal to give consent would delay the entry of Apartment 5B for no more than an hour or so. It is entirely reasonable in such circumstances for Torres to consent to the DEA entry of Apartment 5B with his cooperation and in his presence in order to avoid injury to either side. As the Second Circuit has stated:

> *The consent to search by one who realizes that the jig is up and a search warrant will issue in any event is similar to a plea of guilty by one who believes that he will be convicted if he stands trial . . . His act does not become involuntary simply because the consequences would have been the same if he refused . . . Like the defendant who pleads guilty, Lace was attempting to make the best deal he could under the circumstances.*

*United States v. Lace,* 669 F.2d 46, 52–53 (2d Cir.1982) (citations omitted; emphasis added). The plain view observations, then, were properly considered by Magistrate Sinclair.[36] Where an experienced narcotics

---

**36.** Defendants also claim that even if the DEA had consent to enter Apartment 5B, the agents' observations cannot be sustained under the plain view doctrine because under *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), an anticipated discovery where the police know in advance what they will find and where they will find it, cannot be sustained under the plain view doctrine. The court believes that defendants have misconceived the scope of the plain view doctrine. In *United States v. Liberti,* 616 F.2d 34 (2d Cir.), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980), the defendant, an employee of a large department store, was suspected of stealing merchandise and sending it home in the mail. Postal inspectors obtained a search warrant authorizing the seizure of a brown cardboard box containing cosmetic gift boxes. The inspectors did not find the brown cardboard box; however, when the defendant's wife went to a hall closet and opened the door, the agents saw, in plain view, on both the shelf

and the floor, stacked boxes of cosmetics. These items as well as others in plain view were seized by the postal agents. The district court held that the plain view doctrine did not apply, because the inspectors' discovery of the seized items was not inadvertent but was instead "anticipated."

On appeal, the Second Circuit reversed. The court stated:

"What *Coolidge* proscribes is an anticipated discovery, where the police know in advance the location of the evidence and intend to seize it." . . . Mere expectation or suspicion that discovery would occur does not preclude application of the plain view doctrine.

616 F.2d at 37. (Citations omitted) Here although there was an expectation that discovery of narcotics would occur there certainly was no knowledge of the location of the evidence (just as in *Liberti* where the agents expected to find cosmetics but did not know where the evidence was located). This court concludes that the

agent has seen a quantity of bags containing white powder, little if anything more is needed to show probable cause. *United States v. Moon,* 351 F.2d 464, 465 (2d Cir.), *cert. denied,* 383 U.S. 929, 86 S.Ct. 936, 15 L.Ed.2d 848 (1965); *United States v. Denevere,* 332 F.2d 160, 161 (2d Cir.1964).

### 3. *Exigent Circumstances*

This court further finds that even in the absence of valid consent, exigent circumstances justified the entry into Apartment 5B so that the DEA agents did not run afoul of the Fourth Amendment. The general rule is that "a search conducted without probable cause is '*per se* unreasonable ... [is] subject ... to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Consent is one such well-delineated exception. *See e.g., United States v. Vasquez-Santiago,* 602 F.2d 1069 (2d Cir.), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); *United States v. Tortorello,* 533 F.2d 809 (2d Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). The exigent circumstances exception is gaining judicial recognition. *United States v. Martino,* 664 F.2d 860 (2d Cir.), *cert. denied, sub nom. Miller v. United States,* —— U.S. ——, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1972); *United States v. Vasquez, supra.* Such judicial recognition is consistent with dicta in a number of Supreme Court opinions. *See e.g., Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981) ("The search at issue here took place in the absence of exigent circumstances. Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless pursuant to a warrant."); *Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980) ("[I]t is arguable that the warrantless arrest might have been justified by exigent circumstances."); *see also Johnson v. United States,* 333 U.S. 10, 13–15, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948).

In *United States v. Martino, supra,* Judge Kearse stated:

> [W]e have held that where a lawful arrest was made on the street outside the defendant's apartment, and the officers had a legitimate basis for believing there were other persons inside the apartment who were likely to be aware of the arrest and therefore might destroy evidence in the apartment, a warrantless entry into and security check of the apartment was permissible.

664 F.2d at 869. In *United States v. Martino, supra,* DEA agents arrested the defendant and were eager to arrest his co-conspirators, who had just delivered a million-dollar package of heroin, and to take custody of the heroin. One of the agents entered the defendant's yard, retrieved the bag of heroin and continued in pursuit of the co-conspirators. While the entry may have otherwise infringed the defendant's Fourth Amendment rights, "the circumstances in which [the agent] was required to act provided no reasonably satisfactory alternative." *Id.* at 870. This was because the agents knew that the defendant's accomplices were in the habit of frequenting his premises, and if the agent had foregone the opportunity to seize the heroin, he "would have chanced the theft or destruction of the heroin in his absence, either by accomplices of [the defendant] ... or by an occupant of the house." *Id.* Under these circumstances, Judge Kearse stated:

> [F]or [the agent] to have guarded the yard, awaiting the arrival of additional agents who could telephone for a search warrant would have allowed the defendants to escape. We conclude that the considerable risk that if [the agent] did not enter the yard and seize the heroin he would allow either the contraband or the culprits to get away, presented circumstances sufficiently urgent to warrant [the agent's] unauthorized entry into the yard and seizure of the heroin.

664 F.2d at 870. This case presents circumstances quite similar to those discussed by

DEA agents' observations were within the am-

bit of the plain view doctrine.

Judge Kearse. Here Torres left his home at approximately midnight in order to purchase some milk for his daughter.[37] It was already one a.m. when, after a lawful arrest, the agents drove the defendant to the McDonald's parking lot. Under such circumstances, the agents were faced with the possibility that unless they acted swiftly, the occupants of Apartment 5B, having become alarmed at Torres' unexplained absence, would either flee or destroy evidence.[38] Even if these facts are not compelling, the situation becomes more urgent when Torres shouted through the locked door informing the inhabitants that he was in the presence of federal agents or police. About this situation, the Supreme Court has stated:

> [T]he Fourth Amendment is violated by unannounced police intrusion into a private home, with or without an arrest warrant, except ... where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.

*Ker v. California,* 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963) (Brennan, J. dissenting); *see Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1969) (adopting Brennan's dissent in *Ker v. California*). As soon as Torres announced that police were outside the door, the officers heard panicked voices, scuffling, and rapid footsteps. As Judge Friendly has stated, "While running and scuffling after such an announcement may be innocent, narcotics agents are entitled to use their knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic." *United States v. Manning,* 448 F.2d 992, 998–999 (2d Cir.) (on

rehearing en banc), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971). Thus, this court concludes that where the inhabitants of a narcotics lair, already likely to be concerned about the prolonged and unexplained absence of Torres, behaved in a manner which indicated that destruction or concealment of evidence was immediately likely to occur, exigent circumstances justified the entry into Apartment 5B even in the absence of consent.

### C. Conclusions

This court concludes that three separate grounds support the issuance of the search warrant for 2526 Bronx Park East. First, the statements in the affidavit relating the statements of the informant and the corroboration of that information are by themselves sufficient to supply probable cause under the combined tests of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Second, the court finds that Torres consented to entry of Apartment 5B so that the plain view observations of the DEA agents were properly considered by Magistrate Sinclair in determining probable cause. Finally, this court concludes that exigent circumstances existed which rendered a nonconsensual entry into Apartment 5B constitutionally permissible. Since exigent circumstances justified their entry, the agents' plain view observations were properly considered in the probable cause determination.

Since the search warrant for 2526 Bronx Park East was based upon probable cause, the search warrant for Torres' apartment at 774 East 236th Street was also constitutionally valid. Defendant's claim that the search of the 774 East 236th Street premises violated the Fourth Amendment is based on its sole contention that the second search warrant was based upon evidence illegally seized at 2526 Bronx Park East.[39] Since

---

37. Tr. at 244.

38. Torres left his house at 12:30 a.m. to get milk for his daughters, *see* note 28 *supra.* He had been gone over half an hour before the

DEA agents brought him back to 2526 Bronx Park East.

39. Defendants wisely do not question the sufficiency of the evidence seized at 2526 Bronx Park East, *i.e.,* drugs, dilutents, and weapons to

this court concludes that the search of 2526 Bronx Park East was legal, it follows that the search of 774 East 236th Street was also constitutionally permissible. For these reasons, defendants' motion to suppress evidence is denied.

supply probable cause for the search warrant for 774 East 236th Street.