**UNITED STATES of America**

v.

**Dominic TUFARO, etc., et al.,
Defendants.**

**No. S 82 CR 0838 (WK).**

United States District Court,
S.D. New York.

Oct. 12, 1983.

Gerald Shargel, New York City, for Dominic Tufaro.

Robert Ellis, New York City, for Ronald Marrazzo.

Edwyn Silberling, New York City, for Nicholas Bonina.

Jay Goldberg, New York City, for Frank Pasqua.

Sheryl E. Reich, New York City, for Rosemary Pasqua.

Lewis Novod, New York City, for Gabriel Letizia.

David Greenfield, New York City, for Guido Penosi.

Murray Richman, New York City, for Joseph Wilson, William Castaldi.

Vincent Anzalone, c/o Murray Richman, New York City, for Frank Torrioni.

Jeffrey Hoffman, New York City, for Frank Pasqua, Jr.

Michael F. Coiro, Jr., Bellmore, N.Y., for Frederic Sindona.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

### INTRODUCTION

The indictment in this case contains thirteen counts and names twenty-one defendants.[1] Count One charges defendants Dominic Tufaro, Ronald Marrazzo, Frank Pasqua Jr. ("Pasqua Jr."), Frank Pasqua ("Pasqua Sr."), Nicholas Bonina, Alphonse Carmine Persico, Anthony Augello, Frederic Sindona, John Donnelly, Ronald Seifert, Guido Penosi, William Castaldi, Louis Macchiarola, Michael Carbone, Mike Pagano, and Susan Kantor with a conspiracy to distribute heroin. Count Two charges Tufaro alone with organizing a continuing criminal enterprise in violation of 21 U.S.C. § 848. Counts Three through Five, which allege distribution of heroin and possession of heroin with intent to distribute, name Augello, Donnelly, Seifert, Persico, and Sindona. Counts Six through Eight also allege such possession and distribution, Count Six naming Tufaro, Marrazzo, Pasqua Jr. and Pasqua Sr.; Count Seven adds Macchiarola and Carbone to this list, and Count Eight names Bonina in addition to the four defendants named in Count Six. A final distribution and possession count, Count Nine, names Bonina alone. Counts Ten and Eleven, which allege a gambling conspiracy and participation in an illegal gambling business respectively, name Pasqua Jr., Pasqua Sr., Gabriel Letizia, Rosemary Pasqua, Frank Torrioni, William Cilenti, John Doe "Al", and Joseph Wilson. Count Twelve, a RICO count, has three parts. Part (a) charges Tufaro, Marrazzo, Pasqua Jr. and Pasqua Sr. with participation in a conspiracy to distribute heroin, and with distribution of heroin. Part (b)(i) charges Pasqua Jr. and Pasqua Sr. with

---

1. The indictment, the second filed by the Government in this case, originally named twenty-two defendants. However, one Anthony Augello, died shortly after having been arraigned, and we granted the Government leave to file a *nolle prosequi* as to him on May 20, 1983.

participation in a gambling conspiracy; (b)(ii) alleges that Tufaro, Marrazzo, Pasqua Jr. and Pasqua Sr. "laundered the proceeds from their narcotics activity in a gambling operation." Part (c), which concerns the distribution of these proceeds, also names these last four defendants. Finally, Count Thirteen charges Marrazzo, Pasqua Jr., Pasqua Sr., Kantor, and Pagano with harboring a fugitive.

We deal in this opinion with various challenges to the court-ordered electronic surveillance of several of the defendants.

## DISCUSSION

It is undisputed that a great part of the Government's evidence in this case stems, either directly or derivatively, from electronic surveillance of the telephone of Pasqua Jr. and Rosemary Pasqua. The application for this wiretap, supported by the affidavit of September 15, 1982 of Special Agent Robert Liberatore of the Federal Bureau of Investigation ("Liberatore affidavit"), was presented to Judge Costantino of the Eastern District of New York, who on September 15, 1982 ordered the surveillance. As a result of evidence obtained from this wiretap, the Government applied for and was granted orders extending this wiretap, authorizing a wiretap on defendant Marrazzo's telephone and a "bug" in his apartment.[2]

**Probable Cause**

Defendants contend that the order for the initial Pasqua wiretap was not supported by probable cause. The Supreme Court has recently enunciated the standard to be used in assessing challenges to probable cause:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him...there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis... for conclud[ing] that probable cause existed."

*Illinois v. Gates* (1983) 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527.[3] This "totality of the circumstances" test directs that, where an application is based on information provided by an informant, we must consider the informant's reliability, veracity, and the basis of his or her knowledge, without giving undue weight to or requiring that specific standards be met as to any one of these factors. We find that, applying this test to the application before us, the wiretap order was supported by a showing of probable cause.

In reviewing the decision of the issuing judge we may, of course, consider only the evidence which was actually before him. *Aguilar v. Texas* (1964) 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723. We must also bear in mind precisely what the Government had to demonstrate by this evidence: namely, the involvement in narcotics activity of Pasqua Jr., whose phone was to be the subject of the tap. We therefore turn to the affidavit of Agent Liberatore.

We note first that Agent Liberatore does not purport to have any first-hand knowledge of any narcotics-related activities on the part of Pasqua Jr., or any other defendant, but rather relates information obtained from other FBI and Drug Enforcement Agency ("DEA") agents and three unnamed confidential informants, "Source A", "Source B" and "Source C." The Liberatore affidavit provides the following information as to these informants:

---

2. This telephone, like the apartment in which it was located, was listed in the name of Susan Kantor. However, it is undisputed that the apartment was occupied not by Kantor but by Marrazzo. The apartment is therefore referred to as "Marrazzo's apartment" and the telephone as "Marrazzo's telephone."

3. *Gates*, of course, dealt with probable cause for an arrest warrant and not, as here, for a wiretap application. However, it is well settled that the standards of probable cause are the same for these—and other—kinds of applications. *United States v. Fury* (2d Cir.1978) 554 F.2d 522, 530, *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776.

Source A has been a confidential informant for the Federal Bureau of Investigation for a period in excess of three years, and during this time, his information has been proven to be reliable, and has been verified through other sources and independent investigation. Source A has been responsible for two arrests, one conviction and seizure of stolen property with a value in excess of $10,000. ¶ 1.[4]

Source B's reliability has been previously established through corroboration of information he provided concerning criminal activity and has been established in connection with this investigation through independent information, to the effect that Source B has met and talked with several of the individuals identified in paragraph 2 [of the affidavit] on many occasions over the past 2 years. ¶ 4.

Source C is a convicted narcotics distributor, currently on federal parole, who has been providing information to Special Agents of the DEA in the period from approximately September, 1981 through the present. ¶ 19.

All parties are agreed that the information most crucial to the affidavit is that provided by Source B, who alone provides any direct information about Pasqua Jr. This information, as stated in the affidavit, is as follows:

5. Since May 1982, Source B has told Special Agent Schiliro that in the course of...conversations with ["several" of Tufaro, Macchiarola, Frank Ferraro, "Patsy Pontiac"] he has learned that Dominic Tufaro, together with RONALD MARRAZZO, operates a very large scale heroin distribution organization, in which FRANK PASQUA, JR. assists them. Source B also related that Dominic Tufaro and RONALD MARRAZZO are both fugitives, and that they work together in their narcotics business as partners.

\* \* \* \* \* \*

7. In several conversations over the past seven months and as recently as the week of August 1, 1982, FRANK PASQUA, JR. told Source B that his work for Dominic Tufaro and RONALD MARRAZZO includes receiving quantities of heroin from Tufaro and/or MARRAZZO, delivering the heroin to distributors in Manhattan, Brooklyn and Queens, and returning to Tufaro and Marrazzo the proceeds which he picks up from the heroin distributors.

8. Since May 1982, Source B has told Special Agent Schiliro that one of the members of Tufaro and MARRAZZO's business explained that because Tufaro and MARRAZZO are fugitives, they are extremely cautious about meeting anyone they don't know and trust or going places where they might be observed or recognized. Thus, Source B said that FRANK PASQUA, JR. serves as an intermediary for both Tufaro and MARRAZZO in their narcotics distribution business and, in this connection, uses his telephone (212) 442–1245 to relay messages and arrange narcotics transactions.

9. Since May 1982, Source B has told Special Agent Schiliro that in conversation with one of the participants in Tufaro's narcotics operation during the past year he has been told that Tufaro and MARRAZZO have a number of heroin customers, including John Donnelly and Ronald Seifert, whom they supply with kilogram quantities of heroin.

10. Since June 1982, Source B has related that during the past 60 days he has been in regular telephone contact with PASQUA over telephone number (212) 442–1245 at his home at 153 Jackson Avenue, Staten Island, New York. During several of these conversations, PASQUA has discussed with Source B PASQUA's ongoing narcotics business.

11. During the week of July 18, 1982, Source B spoke to FRANK PASQUA, JR. on telephone number (212) 442–1245.

4. Paragraph references, unless otherwise stated, refer to the Liberatore Affidavit of September 15, 1982.

They discussed problems PASQUA has encountered with one of the group's distributors, and the supply of heroin to a location in Manhattan.

Additionally, Agent Liberatore states that FBI Special Agent Leahy "observed" Source B place a phone call to Pasqua Jr.'s number and "overheard [Source B] discuss narcotics distribution," which conversation Source B subsequently asserted to Leahy had taken place with Pasqua Jr. ¶ 12. Finally, Liberatore states that his own research indicated that regular calls were placed from Pasqua Jr.'s phone to a phone located at an address where Marrazzo received mail.[5]

Confirmation of certain details of Source B's information, although not of any information directly concerning Pasqua Jr., is provided through the two other informants. Source A confirms that Tufaro was involved in a large-scale heroin operation up until 1975, the last date on which the two were in "personal contact." He also confirms that Tufaro has been a fugitive since that time. ¶ 2. Tufaro's prior conviction for distribution of heroin and his fugitive status since 1975 are further confirmed by Agent Liberatore. ¶ 6. Source A further states that he has been informed "over the past eight years," by unnamed associates of Tufaro's, that Tufaro continues to control a large-scale distribution network through "several closely trusted individuals," refusing to deal with anyone else. ¶ 3. Source C was directly involved, along with an undercover agent, in buying narcotics from two named individuals whom Source B identifies as customers of Tufaro's and Marrazzo's.

■ Before proceeding to apply the *Gates* analysis to this information, we make a few observations as to the general standard to be applied by a court reviewing a magistrate's—or, as here, another judge's—finding of probable cause. As the Supreme Court recently reiterated in *Gates*, " '[a] grudging or negative attitude by reviewing courts toward warrants,' ... is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." 103 S.Ct. at 2331, *quoting United States v. Ventresca* (1965) 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684. We may thus, as *Gates* reminds us, not engage in a *de novo* review or apply overly rigorous standards of proof to a finding of probable cause. Rather, we are bound to consider the order as having a presumption of validity, *United States v. Londono* (2d Cir.1977) 553 F.2d 805, 810; *United States v. Fury* (2d Cir. 1978) 554 F.2d 522, 530, *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776; and give "great deference," *Spinelli v. United States* (1969) 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637, to the determination of the issuing judge. If he had a "substantial basis" for determining that probable cause existed—which analysis we must perform in the same commonsense, non-technical manner as the issuing judge applied to his own determination—we may ask no more.

We agree with defendants that Source B's information is not of the type found so powerful in *Gates, supra,* or *Draper v. United States* (1959) 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, in which informants provided "details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Gates, supra,* 103 S.Ct. at 2335. The informants in these cases had provided specific descriptions of the suspects' *modus operandi,* point and time of departure and

---

**5.** Defendants appear to attempt to negate the implications of these calls by the argument that although the telephone was registered in the name of defendant Kantor, Marrazzo's paramour, in whose name the apartment in which the phone was located was leased, and "[a]lthough Marrazzo was shown to be living at [the same address], Liberatore's affidavit conspicuously glossed over the issue of whether Marrazzo was living in Kantor's apartment." Memorandum of defendants Tufaro, Marrazzo and Pasqua Jr. ("Main Memorandum") at 44. Marrazzo has conceded in his personal motions that he was indeed living in the apartment in which the telephone was located, and we see no reason why this could not or should not have been assumed from the affidavit.

arrival, and even—in *Draper*—manner of dress and walk. While the Government has contended that Source B has provided similarly specific information as to Pasqua Jr.'s *modus operandi*, we cannot agree that the use of a telephone by a suspected narcotics trafficker is analogous to the elaborate scheme of traveling and transporting drugs employed by the defendants in *Gates*.

However, the fact that Source B does not provide such miniscule details about Pasqua Jr.'s alleged illegal activities does not, as defendants imply, vitiate the valuable information which he does supply. Source B makes specific allegations as to certain individuals whom he names as Pasqua Jr.'s "bosses" and customers, thus sketching the outlines of the purported narcotics operation. Further, and more important, he relates evidence gathered from his observations of and conversations with Pasqua Jr. as to Pasqua Jr.'s activity in narcotics trafficking. Much of this information is attributed to specific telephone calls between Source B and Pasqua Jr. which occurred during specified periods of time (although we note that the precise dates of these calls is not given, presumably to avoid facilitating the defendants' recognition of Source B). The fact that this information is attributed to specific sources, chief among which is the defendant himself, lends to Source B's information a support glaringly absent from *Gates*, where the informant's "letter gives absolutely no indication of the basis for the writer's predictions regarding the [defendants'] criminal activities." 103 S.Ct. at 2326. *See also In re Grand Jury Proceedings* (8th Cir.1983) 716 F.2d 493.

Nor need evidence be as detailed as that in *Gates* to warrant judicial approval. Indeed, the evidence of illegal activity here is far more direct and significant than the evidence on which the court upheld a search warrant in *United States v. Perry* (2d Cir.1981) 643 F.2d 38, *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115. In that case, the affidavit supporting the warrant described three-year-old evidence of narcotics trafficking and current evidence of surveillance precautions at the suspect's house:

> automobiles (the usual Rolls Royces and Mercedes Benzes) linked to trafficking in the driveway or speeding away upon sight of the officers; and a statement by [the suspect's wife] that "[t]he Police know what Leroy is doing at the house, he pays a lot of people, he conducts his business out of the house every afternoon." She further stated to the officer that Butler did not live at the house and that he just came there every day to conduct his business.

643 F.2d at 50.

The value of even the more general assertions made by Source B is demonstrated by its direct and persuasive corroboration by Agent Leahy's observation of a narcotics-related telephone call to Pasqua Jr. We reject defendants' contention that this corroboration is worthless because Agent Leahy did not hear the other side of the conversation and thus had no way to confirm his statement that Pasqua Jr.—or indeed anyone—was on the other end of the telephone. This argument, we think, is conceivable but not reasonable. Affidavits in support of warrant applications are to be reviewed, not by scrutinizing every possible implication, twist or turn of the language and evidence presented, but "in a common-sense and realistic fashion," *United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. at 746. It is a commonsense and realistic presumption that when a call is placed to a certain telephone number, and a conversation ensues, the person to whom that number belongs is a party to the conversation. "Courts should not invalidate...warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense manner." *United States v. Ventresca, supra,* 380 U.S. at 109, 85 S.Ct. at 746. We see no reason why Judge Costantino should have assumed, as the defendants urge, that Leahy, who was an FBI agent and not a member of the DEA, misunderstood the subject of the conversation, or was tricked into the misconception that Pasqua Jr. was on the phone with Source B; nor do we see any reason why

we should now accept this far-fetched explanation.[6]

Source B's assertion that Pasqua Jr. uses his phone to conduct narcotics-related activity is further corroborated by the analysis of toll logs performed by Agent Liberatore. Although a pattern of calls to a number, even one identified with a residence where an alleged narcotics dealer and fugitive receives mail, is not in itself probative, it is highly suggestive. Indeed, in *United States v. Todisco* (2d Cir.1982) 667 F.2d 255, *cert. denied,* 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444, probable cause for a wiretap was upheld because, in part, pen registers demonstrated a pattern of calls to known narcotics dealers. While the Liberatore affidavit does not show a "close proximity in time" between these calls and "known sales" of narcotics, as did the affidavit in *Todisco,* 667 F.2d at 258, in the context of the call overheard by Leahy it lends color to Source B's general assertions of a pattern of narcotics activity. Finally, Source A's statements about Tufaro's past and present narcotics activities, although not confirmation of any of Source B's information about Pasqua Jr., serve to place Pasqua Jr. in contact with a "known narcotics dealer," a fact which we may consider in determining whether probable cause existed to believe that Pasqua Jr. was himself involved in such activity. *Perry, supra.*[7]

We turn, finally, to the issue of the veracity or reliability of Sources A, B and C. The holding in *Gates* that this criterion need not be meticulously proven, as some previous decisions had required, is strikingly illustrated by that case's approval of a search warrant based upon information from an anonymous letter-writer as to whose veracity the issuing magistrate of necessity had no information. In light of this, we are not overly concerned by certain points in the "pedigrees" of Sources A and B, quoted above, with which the defendants take issue.[8]

We need devote little space to defendants' challenges to Source A's veracity. Although all information provided by him as to Tufaro's and Marrazzo's activities after 1975 originates from unnamed sources, his "pedigree" prior to that time is unimpeachable and is set forth in enough detail to satisfy even the most grudging review. In light of the secondary and corroborative nature of his information, we do not think that this flaw is serious enough to warrant a finding of no probable cause.

---

**6.** Defendants further challenge this corroboration on the grounds that it is described in the Liberatore affidavit merely as concerning "narcotics distribution," while Source B reports Pasqua Jr.'s descriptions of his conversations with others in slightly more detail, as for instance, stating that they involved Pasqua Jr.'s difficulties with certain dealers. From this distinction without a difference, they attempt to build a case for their proposition that the conversation in which Source B participated did not concern narcotics at all ("if there had been a blatant discussion of drugs, the affidavit would have been far more specific," Main Memorandum at 43). Since the subject of the conversation was reported by Agent Leahy, who overheard it, we can only assume that this piece of non-logic is intended as a further challenge to his intelligence, perspicacity, veracity, or some combination thereof. As such, we find it unfounded and reject it for the reasons stated above.

**7.** We place no reliance on the other "corroboration" of the information about Pasqua Jr. which the Government urges upon us. Tufaro's prior convictions and fugitive status, alluded to by Source A, are no more than matters of public record available to anyone who wished to search them out. *See Gates, supra,* 103 S.Ct. at 2335. Source A provides no evidence of any connection between Pasqua Jr. and Tufaro; although he, like Source B, states that Tufaro deals with only a trusted few, Pasqua Jr. is not named. Similarly, Source C's corroboration that Donnelly and Seifert, alleged by Source B to be customers of Tufaro and Marrazzo, were in fact engaged in fairly high-level drug dealing might have some usefulness were this an application for a tap on the phone of one of these men; however, in the absence of a link between them and Pasqua Jr., they have no bearing on Pasqua Jr. other than to place him in the company of other suspected or known drug dealers. Corroboration of such a link between these men is nowhere present in the affidavit; nor may we consider, as the Government urges, information about such a link obtained *after* the warrant was issued.

**8.** Defendants do not challenge the veracity of Source C.

Nor are we overly concerned that Source B's credentials are not presented in as much detail as Source A's. Contrary to defendants' assertion, it is not necessary that the affidavit state the number of arrests or convictions with which an informant can be credited. It is, of course, undeniable that Source B's "pedigree" is quite generally stated. Indeed, we cannot help but find it vague as to the establishment of his reliability in connection with the investigation in this case, since it does not even specify whether the individuals as to whom there is "independent evidence" that Source B "has met and talked" are defendants in this case. However, the description of his reliability is nonetheless sufficiently specific to withstand the defendants' challenge. Indeed, it is more specific than that approved by the Court in *United States v. Martinez-Torres* (S.D.N.Y.1982) 556 F.Supp. 1236. In that case, the affidavit stated merely that the informant's "reliability has been established previously and has been established by the investigation conducted in this case." 556 F.Supp. at 1249. The court held that this statement, "even if inadequate by itself to satisfy the veracity [test], is corroborated by independent DEA investigative efforts." In that case, which involved narcotics and firearms violations, the following corroboration was found sufficient:

> [W]hen agents approached the two men who had just left Apartment 5B, "two (2) handguns were thrown out of the vehicle they had entered after they left Apartment 5B." Not only does this incriminating corroboration suggest efforts at concealing criminal activity, but it also lends some direct support for the informant's earlier statement that Apartment 5B was used as a storage of weapons.

*Id.*

We find that the corroboration provided by Source B's overheard telephone call is at least as suggestive, if not probative, of alleged criminal activity as the above. Agent Leahy's statement directly corroborates the veracity of both levels of Source B's claims: first, that Pasqua Jr. was involved in narcotics distribution; and second, that Source B was in possession of this information because Pasqua Jr. was in the habit of discussing it with him over the telephone. We are also mindful of the "consistently recognized...value of corroboration of details of an informant's tip by independent police work," *Gates, supra,* 103 S.Ct. at 2334. Here the various agents corroborated not only Source B's general allegation as to Pasqua Jr.'s involvement in narcotics trafficking, but also as to his connections and frequent telephonic communications with various narcotics dealers and fugitives.

As the Supreme Court said in *Gates,* the informant's "veracity" or "reliability" and his "basis of knowledge" ... are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. 103 S.Ct. at 2329. *See also United States v. Peyko* (2d Cir.1983) 717 F.2d 741.

■ Thus, the fact that none of the informants made any specific predictions as to the defendants' behavior, or gave detailed descriptions of their narcotics activity—which, we repeat, does not in any event vitiate their tips—is more than adequately compensated for here by their established histories of veracity and by the corroboration of their information both by "independent police work" and by each other. *See United States v. Vazquez* (2d Cir.1979) 605 F.2d 1269, 1281, *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408. Considered as a whole, the evidence before Judge Costantino was thus enough to demonstrate "something more substantial than a casual rumor circulating in the underworld or an accusation based on an individual's reputation," *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. at 589. No more is or ever has been required.

**Franks Hearing**

Defendants further contend that, even if the Liberatore affidavit justified Judge

Costantino in ordering the use of electronic surveillance, it contained mistakes which, if corrected, would no longer support a finding of probable cause. They request the remedy mandated by the Supreme Court in *Franks v. Delaware* (1978) 438 U.S. 154, 155–156, 98 S.Ct. 2674, 2676–2677, 57 L.Ed.2d 667:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Most of the defendants' challenges to the Liberatore affidavit stem from their assumption that "Source B," who as we have said is unnamed in the affidavit, is in reality one Dennis Mulligan, an acquaintance of Tufaro, Marrazzo, and Pasqua Jr. Since the Government has not directly controverted this hypothesis,[9] we must accept it as true for purposes of this motion.[10]

Assuming, then, that Source B is Dennis Mulligan, we must agree with defendants that the Liberatore affidavit failed to mention two circumstances relative to his credibility. First, Dennis Mulligan was previously convicted of perjury[11]. Second, Mulligan was dropped from an indictment[12] in May, 1982, approximately the same time that, according to defendants' hypothesis, he became active as "Source B."

As a threshold matter, the remedy of a *Franks* hearing applies when the Government's affidavit omits a material fact, as well as when it contains material misrepresentations. *United States v. Shakur* (S.D.N.Y.1983) 560 F.Supp. 318, 328; *United States v. Dorfman* (N.D.Ill.1982) 542 F.Supp. 345; *United States v. Vazquez, supra,* 605 F.2d at 1282. To do otherwise "cannot be squared with *Franks'* demand that the Government not frustrate the magistrate's review of probable cause by deliberately or recklessly providing misleading information." *United States v. Dorfman, supra,* 542 F.Supp. at 367.

There is no merit in any of the Government's arguments that their omissions were not at least reckless. We have no reason to disbelieve Agent Liberatore's claim that he had "never heard the name Dennis Mulligan" prior to the defendants' submission of these motions, Liberatore affidavit of June 13, 1983 at ¶ 5, and thus, presumably, that he had never heard of the above facts about Mulligan and would not have noticed their omission from an affidavit. However, this gets the Government nowhere. What Liberatore may not have known was obviously within the knowledge of the agent who, under Liberatore's supervision, was responsible for Source B's activities; and—as *Franks* makes clear, 438

---

**9.** Agent Liberatore states in his affidavit of June 13, 1983, submitted in opposition to this motion, "until I read the papers filed by defendants in this case, I had never heard the name Dennis Mulligan." ¶ 5. Since Liberatore had no direct contact with Source B and thus need not have known his name at all, we consider this carefully worded statement somewhat less than a direct denial. We note especially that the Government did not take exception to our statement to this effect at oral argument, nor to our acceptance, for purposes of this motion, of defendants' hypothesis as to Source B's identity.

**10.** Since we make this assumption, we see no purpose in a disclosure of Source B's identity by the Government, and defendant's motion to that effect is accordingly denied.

**11.** *United States v. Mulligan* (2d Cir.1978) 573 F.2d 775, *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120.

**12.** *United States v. Napolitano* (S.D.N.Y.) 82 CR 803 (RWS).

U.S. at 163–164 n. 6, 98 S.Ct. at 2680 n. 6—it was Liberatore's obligation to ascertain and present to the issuing judge all facts concerning the informant's reliability that may have been within the knowledge of agents acting under his supervision.

■ We thus pass to the question of whether "the affidavit would have been insufficient to establish probable cause if the omitted material were included." *United States v. Balistrieri* (E.D.Wisc. 1982) 551 F.Supp. 275, 278. In this we are essentially faced with a question of first impression. *Gates* removed a great deal of the emphasis which prior cases, stemming from *Aguilar v. Texas, supra,* had placed upon the credibility of an informant. In *Gates,* however, the Court was faced with an anonymous informant about whom nothing, either good or bad, was known. We, on the other hand, must decide what effect upon the "totality of the circumstances" must result from information detrimental to an informant's established credibility. While we do not by any means condone the omission, in whatever way or for whatever reasons made, we find that the particular facts omitted, considered in detail and in context, are not so grave as to affect probable cause.[13]

In appraising the importance of the omissions, we must take into account that, on the facts already disclosed to him, Judge Costantino must have assumed Source B to be a cooperating individual hoping to gain governmental favor as a result of his cooperation. Such an individual, by hypothesis, is one who has committed a crime or crimes carrying with it or them sentencing consequences of sufficient gravity to make cooperation worthwhile.[14] What new light would be shed upon such an individual's "reliability" by the information withheld here?

In the first place Judge Costantino would have been advised that the prosecution for one of the individual's criminal activities had actually proceeded to the point of indictment before any cooperation understanding had been reached. We fail to see any significance in this time sequence. Secondly, he would have learned that the individual had been convicted of "perjury." However, a full disclosure of the pertinent facts would have revealed that this perjury was committed in a grand jury investigation in which the individual was a target and in the course of which—in unsuccessfully protesting his innocence—he had denied making a certain telephone call of less than two minutes' duration to an alleged co-conspirator. This denial came into unhappy conflict with the telephone company's long-distance records, but there was no indication of the content of the call or whether or not it had any criminal significance. Certainly, this information could not rationally cause a judge to question information given by an otherwise reliable informant such as Source B.

■ We need devote less time to defendants' other allegations of misstatements. The Liberatore affidavit states that "[d]uring the week of July 18, 1982, Source B spoke to FRANK PASQUA, JR. on telephone number (212) 442–1245. They discussed problems PASQUA has encountered with one of the group's distributors, and the supply of heroin to a location in Manhattan." ¶ F(11). Pasqua Jr. asserts that the only phone call to which this could possibly refer was with Dennis Mulligan, but that the content of the call is misrepresented by the affidavit. At oral argument, counsel for Tufaro, who presented this motion, candidly admitted that this allegation might be "a little too self-serving to pass muster with the Court" and hence might provide insufficient grounds, on its own,

---

**13.** We note that we have been little helped in this investigation by the Government, whose 146–page brief in opposition to defendants' motions devotes a scant two pages to the *Franks* issue, and not one word to the issue of these omissions, which subject it appears to have overlooked entirely.

**14.** The fact that "we entertain some doubt as to an informant's motives" does not, of course, vitiate his information. *Gates, supra,* 103 S.Ct. at 2329.

for a *Franks* hearing. Tr. at 95. We agree that this does not amount to the "substantial preliminary showing" required by *Franks*. As the court there explained,

[to] mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

438 U.S. at 171, 98 S.Ct. at 2684.

Defendants further claim that the Liberatore affidavit misrepresents the relationship of Source B to Tufaro and Marrazzo in the following two paragraphs:

38. Likewise, the use of undercover agents and informants can only provide limited information concerning PASQUA's criminal business. Thus, the undercover investigation of John Donnelly has not revealed the full scope of the narcotics relationship between Donnelly and "Carmine" Persico, nor provided information or evidence linking them to Tufaro and MARRAZZO. It is also clear that Donnelly is unwilling to involve himself to any further extent in any undercover sales in the future. Similarly, Tufaro and MARRAZZO Have indicated that they will not meet anyone whom they do not know.

39. Additionally, Source B although aware of PASQUA's narcotics business, is not in a position to obtain additional, direct information or evidence because his relationship with PASQUA [sic], and any direct approach (or introduction of an undercover agent) would be con-

sidered very suspicious. Even if successful, however, such an approach would be unlikely to reveal the full scope of PASQUA's narcotics business, including his relationship with Tufaro, MARRAZZO and others, since Tufaro and MARRAZZO would most likely refuse to deal directly with anyone except PASQUA.

■ In substance, defendants insist that we must infer from these paragraphs that Source B lacks access to defendants Tufaro and Marrazzo, while both of these defendants have asserted in their affidavits in support of his motion that they in fact knew Mulligan well and saw him fairly often. However, we merely find these paragraphs to be obscure, and not false, on this issue. We find no substantial preliminary showing as to defendants' allegation of misrepresentation, especially in light of the fact that neither Tufaro nor Marrazzo challenges Liberatore's ultimate conclusion that Source B could not obtain direct information or evidence of the defendants' narcotics activity.

■ Furthermore, even were we to find that a substantial preliminary showing had been made as to the existence of a misrepresentation regarding Source B's relationship to Tufaro and Marrazzo, such a misrepresentation would not warrant a *Franks* hearing, since such a hearing is appropriate only "if the allegedly false statement is necessary to the finding of probable cause." *Franks, supra,* at 156, 98 S.Ct. at 2676; *see United States v. DePoli* (2d Cir. 1980) 628 F.2d 779, 785. The facts allegedly misrepresented here have no bearing on our finding of probable cause, but are relevant only to our consideration, discussed below, of whether the Government exhausted all alternative investigative means before requesting permission to conduct electronic surveillance.[15]

We further reject defendants' contention that any misrepresentation as to this issue

---

**15.** Indeed, evidence of a close relationship between Source B and Tufaro or Marrazzo might well strengthen the affidavit's showing of probable cause, since it would indicate that Source B's information came from first-hand contact with the alleged "kingpins" of the narcotics operations.

"proves" that Liberatore, and not Source B, is responsible for any other alleged misrepresentations in the affidavit. "The deliberate falsity or reckless disregard whose impeachment is permitted [in a *Franks* hearing] is only that of the affiant, not of any nongovernmental informant." *Franks, supra,* 438 U.S. at 171, 98 S.Ct. at 2684. Defendants' attempt at bootstrapping, for which they have presented more convoluted conjecture than evidence, does not make their contention any less self-serving, nor does it fill the gap in the proof of a material omission or misstatement.

■ Finally, defendants contend that since the Government did not use Source B to obtain consensual recordings of his discussions with Pasqua, Jr., or to arrange a narcotics purchase, it therefore must have misrepresented the closeness of Source B's relationship to Pasqua, Jr. This elastic inference stretches beyond the reach of the evidence. Nothing in the record supports defendants' supposition, and Special Agent Liberatore's affidavit of June 13, 1983 at ¶ 3 definitively lays it to rest with the revelation of Source B's refusal to cooperate in any investigative method which would reveal his identity.

### Alternative Investigative Procedures

Defendants further urge that all fruits of the Pasqua, Jr. wiretap must be suppressed because, they contend, the Government failed to attempt all possible alternative investigative procedures and the Liberatore affidavit failed to state why such alternative measures had not been taken, in violation of 18 U.S.C. § 2518(1)(c).[16]

Perhaps, the most dramatic way to approach defendants' contention is to contrast the facts before us with those in *United States v. Lilla* (2d Cir.1983) 699

F.2d 99, the authority upon which defendants principally rely. The defendant against whom the *Lilla* surveillance was directed was a "small-time" narcotic dealer who had sold a pound of marijuana to an undercover state trooper, and promised to be able to provide some cocaine. The undercover trooper, who made the purchase on his first introduction, was immediately given the defendant's home and business phone numbers; and the defendant gave every indication of being willing to continue the illicit relationship. As the court noted, the defendant in *Lilla* "operated more openly than most and with less care in terms of evading detection." 699 F.2d at 104. Nonetheless, rather than developing his thus-far successful investigation of the defendant, the trooper sought and received approval for wiretaps. This the court could not countenance, rejecting the Government's conclusory statements that it had fulfilled its obligation under 18 U.S.C. § 2518(1)(c).

■ In the case at bar, on the other hand, the objective was a sophisticated "big-time" operation, dealing in kilograms of heroin. The alleged principals—including two fugitives from justice—exhibited an extreme sensitivity to surveillance: as Liberatore stated, "Tufaro and Marrazzo have indicated they will not meet anyone whom they do not know." Liberatore Affidavit at ¶ 38. The leaders of this operation worked on the wholesale level through surrogates: "Tufaro and Marrazzo would most likely refuse to deal directly with anyone except Pasqua." Liberatore affidavit at ¶ 39. Source C, who had made two purchases of 27 and 589 grams of heroin from one of the alleged conspirators, was given the cold shoulder and shut off from further contact once the defendant became suspicious of

16. 18 U.S.C. § 2518 states, in relevant part:
(1) Each application for an order authorizing or approving the interception of a wire or oral communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

agents surveilling the second transaction. The agent was thus prevented from making a significantly larger third purchase of over 5 kilograms of heroin. Far from giving out their phone numbers to undercover operatives on their first encounter, the defendants here were highly secretive—defendant Tufaro's residence was only located after his arrest, despite months of investigation.

In these circumstances, it seems wholly reasonable for Judge Costantino to have accepted Liberatore's assurance of the futility of alternative methods of investigation such as surveillance of Pasqua Jr.'s home (which was in a residential neighborhood where surveillance would in any circumstance be difficult, Liberatore affidavit at ¶ 36) or the residences of Marrazzo or Tufaro, which were at that point not known. We do not agree with defendants that these assurances are similar to those provided in *United States v. Kalustian* (9th Cir.1976) 529 F.2d 585, 587–588, on which case defendants rely. In *Kalustian*, the affiant agent simply elaborated briefly on the statement that in his experience no gambling operation could ever be cracked by less intrusive means than electronic surveillance; no mention was made of the defendants or the particular circumstances to be investigated. Here, on the other hand, Agent Liberatore did provide just such descriptions.

We find further that the Government did not fail either to make full use of Source B or to explain why he was not used to obtain further information. The crucial information with respect to Source B's relationship to the targets and his usefulness in producing evidence is set forth in ¶ 39 of the Liberatore Affidavit:

39. Additionally, Source B although aware of PASQUA's narcotics business, is not in a position to obtain additional, direct information or evidence because his relationship with PASQUA and any direct approach (or introduction of

an undercover agent) would be considered very suspicious. Even if successful, however, such an approach would be unlikely to reveal the full scope of PASQUA's narcotics business, including his relationship with Tufaro, MARRAZZO and others, since Tufaro and MARRAZZO would most likely refuse to deal directly with anyone except PASQUA.

Defendants assert, first, that this fails to explain why the Government did not gather information through Source B by such means as a "wire" (an electronic recording device placed on Source B's person), testimony, or by having Source B either transact a deal himself or introduce an undercover agent to transact a deal with some of the defendants. Secondly, defendants assert—on the assumption, which we have said we accept for the purposes of this motion, that Source B is Dennis Mulligan—that Source B was in the confidence not only of Pasqua Jr. but also of Marrazzo and Tufaro, a fact which the Liberatore affidavit does not mention in its recital of Source B's contacts and limitations.

We cannot agree that the first allegation is true or the second significant. While ¶ 39 is unquestionably general, and even leaves incomplete a crucial sentence, its meaning is clear: Source B could get close to the principal targets of the investigation, but his closeness was limited and fell short of allowing him to obtain the sort of information which would enable the Government to discover the details and scope of the target narcotics operation. We find it irrelevant that Liberatore did not state that this relationship held true for Tufaro and Marrazzo as well as for Pasqua Jr., since his conclusion applies in any event. We note particularly that Tufaro claims only that he and Marrazzo met often with Mulligan, "spoke freely" with him, and—in Tufaro's case—was close enough to him to advance him money when his (unspecified) activities resulted in legal trouble. Tufaro affidavit at ¶ 6.[17] Although Pasqua Jr.

17. Marrazzo's affidavit does not broach the issue of his relationship with Source B/Mulligan, other than to describe one occasion on which he

suspects Mulligan of having kept him away from his apartment in order to facilitate the planting of a bug. We note with interest, how-

also appears to have spoken frequently and candidly with Source B, there is nothing to suggest that such confidences, while clearly apprising Source B of the nature and some details of the defendants' business, would admit him far enough into the inner circle to allow him to produce evidence about the full scope of the operation. While we do not reject Tufaro's contentions, we do not see that they are in any way inconsistent with such limitations. We therefore decline to find either the Government's activities or the Liberatore affidavit fatally deficient, and we deny the motion.[18]

## Challenges to Subsequent Electronic Surveillance

We need devote no further discussion to defendants' challenges to subsequent wiretap orders and extensions and orders permitting electronic eavesdropping or "bugs," insofar as these are based on defendants' claims that the September 15 Liberatore affidavit was invalid and thus tainted all subsequent orders which relied on information derived from the Pasqua wiretap. There are, however, a few additional challenges to the subsequent electronic surveillance which merit some discussion.

Defendants challenge the propriety of extending the Pasqua wiretap, which had been authorized for the purpose of intercepting narcotics-related conversations, to include gambling-related conversations as well. It is undisputed that, having heard some of these latter kind of conversations during the first week of surveillance, the Government reported them to Judge Costantino in its first seven-day report, as required by *United States v. Tortorello* (2d Cir.1973) 480 F.2d 764, *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86, and immediately requested the extension. Defendants further do not seem to challenge that these first gambling conversations were properly intercepted under the "plain view" doctrine of *Tortorello, supra.* Their contention is, rather, that the extension should not have been granted because the Government failed to demonstrate that there were no alternative investigative means for discovering information about this activity. Specifically, they claim that the extension order is invalid under *United States v. Santora* (9th Cir.1979) 600 F.2d 1317, because no "alternative investigative means" showing was made as to the persons involved in the gambling conversations who were not also involved in the narcotics conversations.

*Santora,* however, does not stand for the proposition that a fresh showing is required each time the Government wishes to monitor the conversation of a new suspect or set of suspects, as the defendants claim. Rather, in that case, the Government had obtained an order authorizing a tap on one suspect's telephone. It then applied for another order, for a tap on the telephone of another person whose conversations had

ever—in light of Tufaro's representations as to their closeness—Marrazzo's statement that, in contrast to the above occasion, "[a]t every other meeting that I had with Dennis Mulligan during the preceeding two years I would stay with him for approximately 15 to 30 minutes." Marrazzo Affidavit at ¶ 4.

**18.** Defendants make much of the following statement in the Liberatore Affidavit of June 13, 1983, submitted in opposition to this motion:
   3. From the first time I learned of Source B's existence, through the present day, I have understood that he has absolutely refused to testify at a public trial or have his identity become know [sic] to the targets of his investigation, for fear of his life. Accordingly, Source B could not wear a recording device during his conversations with Pasqua [Jr.] and other members of Tufaro's narcotics organization because that would necessarily create a recording which would identify him and have to be provided to the defendants. Likewise, by introducing an undercover agent to Pasqua [Jr.], Tufaro or other members of that group, Source B's identify [sic] would have been revealed. Therefore, the alternative techniques that defendants suggest were *not* available, just as I stated in my original affidavit.
Emphasis in original; footnote omitted.
Since this explanation was not included in the affidavit which accompanied the application for the wiretap, it cannot, of course, fulfill the requirements of 18 U.S.C. § 2518(1)(c). However, we assume that this paragraph was intended as a supplementary explanation to the explanation proffered in ¶ 39 of the original Liberatore Affidavit, which, as we have stated, we find sufficient on its own to fulfill the statute.

been overheard pursuant to the original tap. In this second application, however, no showing of the impracticability of alternative investigative means was made as to the intended subject; rather, the Government simply repeated those allegations as to the subject of the first tap, on whose phone the second subject was originally heard. The court held that this did not provide for the second subject the protections envisaged by Congress in 18 U.S.C. § 2518(1)(c).

In the instant case, on the contrary, the Government did not seek to tap the telephones of the "gambling defendants," but merely to listen to their conversations about gambling on Pasqua's telephone. Defendants have provided us with no authority, and we know of none, for the proposition that in such a circumstance an additional showing need be made as to new conversants on a new subject. We are convinced that this is not the sort of protection Congress had in mind. Indeed, were we to agree with defendants, we cannot see why we would not equally be forced to hold that a fresh showing as to alternative investigative means would be necessary each time a new voice is heard on an intercepted wire. This, we think, goes against common sense.

■ The sole question before us thus concerns not the new suspects, but the original suspect and the new offense: that is, was the Government properly authorized to continue to listen to gambling conversations which occurred over Pasqua, Jr.'s telephone? We think the answer is clearly yes. The affidavit repeated the assertions, discussed above, as to Pasqua's alertness to surveillance, the character of his neighborhood, and the ineffectiveness of other less intrusive means of information gathering. While these are not specifically stated with respect to gambling, we find that such an explicit statement need not be made, since only common sense is necessary to discern that a subject who will become suspicious of investigative activity will not have his suspicions set to rest by the Government's own knowledge as to the precise subject of investigation. In addition, since there is no indication that Source B—or any other informant—had any access to information about Pasqua, Jr.'s gambling activities, the issues of introducing an agent, wearing a wire or obtaining direct testimony as to these activities would seem to be removed. We thus find that Judge Costantino properly authorized the extension of Pasqua wiretap to include gambling conversations.

■ Defendants further challenge certain statements made by Agent Liberatore in his affidavit of October 15, 1982, in support of the application for an extension of the wiretap order. Agent Liberatore summarized the narcotics-related conversations which had been overheard during the initial period of the interception. Of his summaries of or references to forty or more conversations, the defendants assert that four contain material misstatements sufficient to trigger a hearing under *Franks v. Delaware, supra.* We disagree.

The first conversation whose representation by Liberatore is challenged occurred on September 16, 1982, between Pasqua, Jr. and "Patty." According to Liberatore,

"Patty" told PASQUA that he had received a call from PASQUA'S "girlfriend" and that they should meet the next day, instead of Sunday, "same time and place."

Defendants challenge this summary with the contention that the conversation concerned the death of an infant relative of Pasqua, Jr. While the conversation certainly did concern this latter subject, it also contained the discussion summarized by Liberatore. Pasqua, Jr.'s statement that he might not be able to attend a meeting with the "girlfriend" the next day because the funeral might take place at that time support Liberatore's implicit conclusion that the discussion of the meeting was not merely a continuation of the discussion of the child. We thus do not think his inclusion of this conversation in his report, or his summary of it, contained any misstatement.

Defendants further challenge Liberatore's summary of a conversation held on September 22, 1983 between Pasqua, Jr. and Marrazzo: "PASQUA asked MARRAZZO if 'she got any money.' MARRAZZO said she didn't." ¶ 39. This conversation, as defendants point out, is entirely about a birthday party for someone named Mary. Except for the two-line interchange described above, there is no conversation about anything related to narcotics, unless we assume a fairly elaborate "code" which the Government has not suggested. However, even assuming that this misstatement of the conversation was knowingly or recklessly made, we do not find that it is in any way material, as defendants contend, or would have any effect upon probable cause if removed from the affidavit. This statement is referred to only once in the affidavit, in the following paragraph:

> 48. Based on the conversations intercepted during the weeks of September 15 to September 29, 1982, and the meeting on September 29, 1982, I believe that PASQUA contacts TUFARO and MARRAZZO regularly over (914) 723–9166 and that PASQUA arranged for MARRAZZO and TUFARO to meet with narcotics their customers. Thus, I believe that when PASQUA relayed messages to MARRAZZO and TUFARO about meetings with "Patty" and "Freddy" he was acting as the intermediary in their narcotics business, in which MARRAZZO and TUFARO are the suppliers. Further, I believe that PASQUA collects moneys owed to MARRAZZO and TUFARO. Thus, on September 22, 1982, PASQUA and "Ronnie" (MARRAZZO) talked about getting "money." Similarly, I believe that when TUFARO asked PASQUA, on September 27, 1982, whether he still needed to "get my clothes out of the tailor's," since their meeting had been delayed, that inquiry was a coded reference to getting narcotics from TUFARO's stash.

As this paragraph indicates, the September 22 conversation was but one reason for Agent Liberatore's suspicions about the role played by Pasqua, Jr. Even were we to consider this paragraph without the reference to the call or to the allegation that Pasqua, Jr. acts as Tufaro's and Marrazzo's money collector, the general thrust would not be changed overmuch. There is thus no reason to hold a *Franks* hearing because of this misstatement.

We are similarly unimpressed with the other alleged misstatements in the Liberatore affidavit. Defendants quibble with Liberatore's statement that "on September 21, 1982 at 4:54 p.m. Dominic Tufaro called for Pasqua who was not home." ¶ 39. The transcript shows that in reality Mrs. Pasqua, who answered the telephone, informed Tufaro that Pasqua, Jr. was downstairs, and that she would get him, at which point Tufaro told her he would leave a message instead. Finally, defendants take issue with the following paragraph:

> 40. On September 24, 1982, PASQUA received a call from "Freddy" who told PASQUA to tell his "friend" that they should meet on Tuesday (September 28, 1982) at his (Freddy's) house. That afternoon at 3:46 p.m. Mrs. PASQUA placed a call to (914) 723–9166, and spoke to DOMINIC TUFARO about a call she received from "Ronnie" (MARRAZZO) a few minutes before. TUFARO acknowledged that "Ronnie" had just called Mrs. PASQUA from that location. During that call, Mrs. PASQUA said her husband gave her the (914) 723–9166 number in case of an emergency.

Defendants assert that this paragraph is misleading because it implies that "the two calls are related when, in fact, they are not." If in fact this inference is drawn, the results are negligible. Defendants themselves admit that these "misstatements are not in themselves significant." We find, further, that there is no pattern of material misstatements which could lend them the color defendants urge, especially in the context of the numerous other calls reported in the October 15 affidavit. We therefore find that the extension of the wiretap was properly granted, and deny the motion for a *Franks* hearing on this issue.

An additional tap on Marrazzo's telephone was authorized on October 14, 1982. With respect to the application for this tap, defendant Penosi asserts that the Government failed to demonstrate that a tap on Marrazzo's phone would yield any information other than that available through the tap on Pasqua Jr.'s phone: namely, that Pasqua Jr. and Marrazzo engaged in narcotics-related conversations. The affidavit of Special Agent Thomas Bondanza of October 14, 1982, however, demonstrates more than this. From the affidavit's descriptions of the conversations which had been overheard pursuant to the Pasqua Jr. wiretap (¶ 37–48) it could be inferred that, just as Pasqua Jr. used his telephone to discuss narcotics with several people, so Marrazzo—whose voice appears frequently in the overheard conversations—conducted business in this manner with several people. We note especially ¶ 42:

> [After receiving information as to the rescheduling of a meeting,] PASQUA immediately called MARRAZZO at a restaurant on Central Avenue in White Plains, and told him of the change in plans. One half-hour later, at 9:33 p.m. PASQUA received a call from TUFARO, who had apparently spoken to MARRAZZO and who called to confirm that they were no longer meeting Freddy the next morning.

The inference that Marrazzo used his telephone to discuss narcotics with persons other than Pasqua Jr. is further confirmed by the fact that pen registers of Marrazzo's phone reflect "many calls" to two known narcotics dealers. ¶¶ 49–50. This is, we find, an ample showing that the wiretap was necessary to obtain certain information and not merely "an additional useful tool," *United States v. Lilla, supra,* 699 F.2d at 102.

Penosi further alleges that the applications for the various eavesdropping orders were invalid because not properly authorized. Penosi states, correctly, that the Assistant Attorney General who authorized those applications was vested with the authority to do so by Attorney General Civi-

letti in Order No. 931–81, dated January 19, 1981, but did not actually sign the first of the authorizations until September 14, 1982, some twenty months after Civiletti had left office. He fails to note, however, that Order No. 931–81 was explicitly reaffirmed by Order 934–81, which was signed by Attorney General Smith on February 27, 1981, and was in effect at the time the authorizations were signed. There was thus no failure in the chain of authorization.

In conclusion, we reject defendants' various challenges to the electronic surveillance used by the Government.